Sherry Savage v. Rabobank Medical Plan Elizabeth Green UBH improperly relied on its own clinical guidelines, which have been shown to not reflect the generally accepted standards of care as affirmed by the Ninth Circuit in the Witt decision. At its core, this case concerns two people, Cindy Seiden and her then 14-year-old daughter, J.S. In 2016, J.S. had struggled with severe mental illnesses, depression, eating disorder, and anxiety for several years. She restricted and purged food, she self-harmed by cutting, and she had several suicide attempts. Her condition and extreme weight loss had necessitated residential treatment. Ms. Seiden was a single mother of twins and an employee of Rabobank. She diligently advocated for continued coverage for her daughter under the Rabobank plan administered by UBH. In an appeal to UBH, she warned that premature discharge from residential treatment had caused her daughter's relapse and readmission. Can I just ask you, with regard to the circumstances here, which certainly are disturbing and tragic in a lot of ways, when it comes to the question of the review of the decision of the administrator, there certainly is evidence that could be interpreted to support further hospitalization, and there's also evidence that would count against that. And so given the standard with which we are reviewing this, I guess I'm speaking to you. You said that the decision was not rational. But if there is, in fact, evidence showing improvement, restoration of weight, those types of things, it reads as if, yes, there's evidence that could be interpreted in either direction. Given the standard of review here of arbitrary and capricious or not supported by the record or lacking in substantial evidence, how do you meet that burden or that standard, I guess? Well, taking two of the examples that you gave, the improvement and the weight loss, gaining some weight in treatment is not evidence that she could maintain that weight independently on her own at home, which is what you each wanted her to do. Are you saying that since the record shows that she gained weight simply because she was being fed liquids, that that is not any evidence that she had actually improved? Yes, that's correct. The goal is for her to eat food. The last report to UBH showed that she was eating 5% of her calories in food, and the rest she was taking in liquid supplement, which is not a sustained calorie source, as Avalon, the treatment provider, told UBH. Now, I'm going to ask the other side of this, because as I read the record, it sometimes looks as though they said we don't need full-time care because she isn't going to get any better either way. And other times it looks as though they're saying we don't need full-time care because she's gotten better. Now, am I correct that there's a certain ambiguity in the decision that was made and whether that means anything in terms of the extremely severe standard? Because, you know, a standard for reversing these is very difficult. Yes, it was arbitrary by UBH to make that decision. And the improvement, I don't think we would be here talking about this if JS had cancer and needed chemotherapy for a year. I think that there is a lot of misunderstanding about exactly what she was going through with the eating disorder and the major depression. There was complaints from UBH that she wasn't engaged in programming, which was correct, because at times she was going through a depressive spiral. She was having major depressive episodes, which she could not get out of bed. And we have to recognize that that is part of the mental illness that she was struggling with. A lack of improvement does not equate to lack of medical necessity. If anything, under the guidelines, lack of improvement means that she continues to need to be in that level of care, that her mental health is not stable, and she continues to require the 24-7-hour care that she was receiving. Could you address a moment that last question about the bills that weren't completely paid and if you want them to be unanswered given as to those? The post-service claims, Your Honor? Yes. So the post-service claims were submitted, and they covered treatment that was not ever considered by UBH. There's time periods where UBH was not involved and did not consider the treatment. The plan provides for post-service claims. ERISA provides for post-service claims, and UBH refused to consider them without explanation. UBH denied benefits in November of 2017 and seemed to have washed its hands of JS and her mother, closing its eyes to the fact that she was continuing to deteriorate, that at that time Ms. Seiden was dying from a terminal brain tumor. When JS would come for a home visit, her mother was having seizures, and JS lost more than three pounds on that visit. But UBH wanted none of this information. It had a fiduciary duty to consider all claims that came before it, and it refused to comply with that duty. Rabobank has supported UBH denials in the face of all this. Is there overlap, though, between the post-service claims and the claims covered by the original set of appeals, the first and the second appeal? In terms of dates? Yes. So the post-service claims were submitted with treatment records for all dates of service. There were some dates in there that, yes, UBH was considering concurrent claims, as they're called, when she remains in treatment. But I will note that even during those concurrent claims, Avalon submitted treatment records and appeal letters to UBH, which they refused to review. So it is their policy position that the post-service— But isn't it a waste of time? I mean, given—assuming we were to decide against you on the main thing, then just sending it back to do this when they've already, in effect, decided, isn't that basically a waste of time? Or do you want us—I know that the thing says they must, so maybe you could do it, but should we do it when it is just a waste of time? Remand to UBH is inappropriate. It's shown a manifest unwillingness to review the medical evidence that supported coverage and to review post-service claims, which it's had in its possession now for seven years. So, no, we would ask that it is not remanded. I'm going to stop with my time. I'll be back. Okay. Thank you. May it please the Court. My name is Sean Pope. I represent the Rabobank plan. You'll note that there's not UBH or UHC here. They weren't sued. This is the Rabobank plan because Rabobank offers a health benefit—helps benefits through a self-funded plan, and those are benefits that it pays out of its own pocket, not from an insurance company. They hired UHC, and UHC used its UHB subsidiary to act as a disinterested third-party administrator to decide issues of coverage and care without any sort of financial self-interest. And that is the highest level of deference that should be given. It is when the person who's paid is not involved in the decision as to whether or not the benefits should be paid. J.S. went to Utah, to Avalon Hills. She did have a lot of troubles. There's no question about that. And this was never a case about whether or not she should be cut off from all treatment. This was a question of what the appropriate level of care was and what the progress of her as a patient at Avalon Hills. Now, you explain to me whether they made this decision because they thought she had gotten better or whether they made this decision because they thought that she hadn't particularly gotten better but that full-time care was not really helpful. Because there are things in the decision that cut both ways. And to the extent that there is some inconsistency, that is something which, despite the huge standard of deference, we might be able to look into. Judge Calabresi, this is a bit of both. There was a bit of both here. There was improvement. There was some improvement by J.S. and she plateaued so that the view of the reviewers was she wasn't going to gain any more improvement by being in residential care. What she needed to do was to go back to her home and have that type of intensive treatment that would be held in the residential setting of her home and do it like that. So it's a little bit of both. There was some improvement, and we acknowledge that. That's why three months were paid for. That's why some additional months were tacked on was for that improvement. But the judgment that was reached was she wasn't going to get any better at Avalon Hills that couldn't be accomplished through what's happening at home. And I want to stress the idea that that's for her good. Yes, there's a huge expense involved in these things, but it's for her good to get her back into her family, get her integrated into her community, and to set up the support system that she needs for long term. She can't stay at Avalon Hills for the rest of her life. Unfortunately, she's not. She's out living her life now and seems to be living it well. Tell me, what do we know about her now? I'm going to ask the other side. Do we have any information which is in the record or not as to what this former youngster is doing now? There's nothing in the record. I tell you, I found her on Facebook, and she's recently engaged and living in Colorado and seems to be very happy, at least on social media. A lot of people are happy on social media, not in real life. A lot of us are much sadder by looking at social media than in real life. But there's nothing in the record. There's nothing in the record that says anything on this. I think that this was a young lady who had a terrible experience because her mother died while she was at Avalon Hills. She was dying and died. That's extremely tragic. But none of that goes into making the decisions here, which is who should be paying for the level of treatment that her mother decided was good for. And the letters acknowledge that the decision being made by UBH wasn't about what necessarily the most appropriate treatment was from a medical standpoint. It was from the standpoint of how do you best transition somebody when you look at these records? Are they improving in this environment? Should they be in another environment? And what could have been done? I could Monday morning quarterback this, but what could have been done was to take her out of Avalon Hills. Let me make sure I understand. What is the company prepared to pay for right now? To pay for right now? Well, I mean, we— I mean, what is the present authorized treatment compensation? I don't understand, Dr. Hodge. Are you saying what is—how much is it? Well, they wanted full hospitalization. Then there was the question of partial hospitalization. Those were denied. So what is it that your client is prepared to pay for? What kind of treatment? I mean, is it, you know, you're prepared to pay for her to see a psychiatrist? I'm just throwing this out twice a week, or you're prepared for her to be in group therapy? I mean, what has been authorized? I'm trying to give you the exact phrase, and I have it written down on here if I can find it. It's called intensive residential therapy. It's an individual psychiatrist. That doesn't tell us anything. I mean, it's nice words, but what is intensive residential therapy? Well, it's intentional therapy at her own residence. She has, as I believe when I drilled down on this, it means that she's guaranteed three private sessions with a psychiatrist a week. More if the psychiatrist determines that that is appropriate. But it guarantees her three psychiatric sessions while living in her home and working with the psychiatrist to set up whatever other support network that she needs. And how often is that reviewed then? Because you might think that that could be even reduced. The family might think it should be increased. How often is it reviewed? It would be reviewed if the family wanted an increase. It would be reviewed as often as they would bring up the fact that it should be increased. It would be reviewed based on consultation with the provider who's treating her. From the other end of it, how often would UHC and UBH review it? I don't know exactly. As I said, I don't represent those entities. But the family has the option, for instance, if there are signs of decline and doctors say this is not working out, it would get reviewed pretty much right away? Yeah. It's treated as an urgent claim within the continuing treatment mode. Okay. I just wanted to make sure I understood how this operated. Right. Yeah. It's not a just leave her off to do what happens and not pay any attention to it. It is – they require reports from the treatment people, the treating psychiatrist. They require reports from them on a regular basis in order to determine if they're continuing to fund that level of treatment. And they take into account the recommendations of those professionals to decide whether or not to continue it. But, I mean, the whole idea here is we're not trying to do anything horrible to JS. We're trying to work out a transition of somebody in her place from the residential treatment, which had its effect and had its value. Now get back to sort of real life, not in Utah, not at the facility there, which is – I mean it is admittedly expensive. And it is admittedly a different level of care, and it takes her out of the idea of having to have more responsibility for herself, which is ultimately what we want to have happen. We want to have this troubled adolescent work from where she was that required her to go to this institution back to being able to care for herself. And at some point, a judgment has to be made that she's ready to make that transition. It was a reasonable judgment, and I think as at least two of you have said, we know this is a very high standard on review. Is there evidence in this record that supports what the reviewers and what UHC and UBH went to, this interested third-party administrator? And there is plenty of evidence in this record to support the idea that they needed to transition JS back to New York. Get her out of Utah, get her back to New York, and get her the type of treatment that would be a long-term solution to her admitted problems. And we're not trying to cut her off and leave her out in the cold. We were trying to get that type of transition, and it was perfectly reasonable. And that's why you should find there was no abuse of discretion and rule accordingly. Good. Okay. All right. Thank you. Thank you, Your Honors. UBH does have a financial conflict of interest. This was determined by a district court in California and affirmed by the Ninth Circuit because UBH did not appeal that decision. A 14-year-old with severe mental illness is not plateaued. Avalon was not willing to give up on her, believe that she could get better, and she has, anecdotally. Her mother's death and dying is critical to the claims here. UBH wanted to transition her home. When home visits with her mother showed that she was restricting food, she was purging in front of her mother, her mother was having seizures, and she would come back to the facility having lost weight. That is not a vote of confidence that she would be able to do this on her own in what UBH recommended was intensive outpatient therapy. That's what it's called. What it actually is is six to nine hours per week of therapy. It provides no supervision for meals. How do we, I guess, Ms. Green, the thing that I'm still struggling with, I mean, these assessments that you're offering and that we're making, we are not, none of us to my knowledge, are not medical professionals. And so when there is a system in place that involves physician peer review and reviewing records and all of that and these determinations are being made, and certainly determinations that could be critiqued, it's hard for me to get to sort of the arbitrary and capricious. Like the things you're mentioning about her relapsing or what have you when she's home with the family, I mean, certainly that's something that intuitively you think, oh, maybe that's a problem. But this was in front of all the individuals reviewing this. And so the idea that, of course, that means this was the wrong decision because when she went home, you know, she started eating less. There is a disconnect, Your Honor. You're correct to note that. I would urge the court to go back and look at particularly the review of Dr. Fisher. I believe it's on page 809 of the joint appendix. And it's stark in that there are comments that are made. There is a review that's done with the facility. And what he takes from that is not what he has given. There's comments that she goes home, she purges in front of mom. The review by the doctor says she had a home visit. Great. Doesn't talk about how she was doing on the home visit. Same thing with weight. She's gained weight. Fine. There's no indication that she could maintain that weight outside of the facility. So there's a real disconnect with the evidence and what the reviewers are being told and then what actually appears in the denials. Yeah, that crucial thing is just what you said. She gained weight in the facility. Is there any evidence in the record that when she was on home and home treatment, she maintained that? No, there's not, Your Honor. But she was not at home during the period of the claim. She was not ever home for more than a period of a week or so. Yes, that's correct. So there was no opportunity to kind of – there was not a period of time where she was at home and getting this outpatient, whatever you want to call it, treatment to really judge that, is there? The home visits at one point had to be completely taken off the table because she was purging so much that they were concerned that her medical values would change. And so there's a safety issue. If she's purging out on, like, the two- and three-day pass that she gets at the facility, she's not ready to do the week pass. But once she was improving a bit, she would do a week home pass. And some were better than others, but mental health is not a linear proposition. It's not the trajectory is up and down. It's a bit ironic because if she had gone home and they had not been willing to pay on their own, there might have been some evidence that the decision to send her home was wrong. But then it's also possible that if that evidence had come in, they then would have been willing to pay. But instead, because they paid, we don't really know what would have happened if she had done what they said was adequate. I am out of time. I would just say that the home visits are the best evidence of exactly how she was managing when she was out of the facility. Other than making sure she eats, what plan was there at Avalon for helping with the underlying conditions that contribute to her eating disorder? Because she had been there for quite a while. And I gather there's some evidence in the record that UBH folks were concerned about the lack of treatment goals or a detailed treatment plan when she returned there. Did I miss what there was for treating her underlying condition? I assume no one thinks that she should just be in this facility for the rest of her life so that they make sure she eats.  Okay. Did I miss the treatment plan? Yes. Rabobank incorrectly claims that Avalon was not clear on the treatment goals. Yet on the same page cited in the record, Avalon actually lists all the treatment goals that it had. And there are things that were moving off of the liquid supplements, trying to really motivate her to eat more food. They had a behavior sort of a performance benefit program set with her where she would put things that she wanted if she were able to finish food. It's like a very intricate plan. She's going through three different individual group therapies. They wanted to do more family therapy with her mom, with her brother. Body image exposure. It's a very comprehensive program. Well, that's one thing that kind of comes through. And I really want to echo what Judge Lee said about how we are not professionals, medical professionals in any way, shape, or form. But there seemed to be very little interaction with the family and some concern that that was contributing to the depression. Or did I misunderstand that? I think it's a misunderstanding. I think that's UBH's spin on it. I think that the family therapy was happening every week. But how? Remotely? Yes, that's correct. And Mother would come out and do visits with her. But the visits by the mother were, it seemed to me, rather infrequent. Or did I misunderstand that? It depends on the time period that we're talking about. There were times where she was not allowed to have a visit outside of the facility. Mother could come and visit her there. Where was the mother residing at this time? Long Island. And the child is in Utah? Correct. There was no place closer to Long Island that could have helped treat the child? That's not in the record. I do know that this facility specializes in young girls who have eating disorders. I understood that. Okay. Thank you. Thank you. Thank you, Your Honor. Thank you very much. Thank you both. Yes, thank you. We will take the case under advisement.